IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



| | |
|---|---|
| CHICAGO TRUCK DRIVERS, HELPERS AND WAREHOUSE WORKERS UNION (INDEPENDENT) HEALTH AND WELFARE FUND, | ) ) ) ) ) |
| Plaintiff, | ) 02 C 3115 |
| v. | ) Judge Ronald A. Guzmán ) |
| LOCAL 710, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHICAGO TRUCK DRIVERS, HELPER AND WAREHOUSE WORKERS UNION (INDEPENDENT) PENSION FUND, | ) ) ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Health and Welfare Fund ("Health and Welfare Fund") seeks a declaratory judgment against Local 710, International Brotherhood of Teamsters ("Local 710") and Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund ("Pension Fund") that the demutualization compensation for four employee-benefit plans of Principal Financial Group ("Principal") is a plan asset and should revert to the participants of the plans. Before the Court is the Health and Welfare Fund's motion for summary judgment and Local 710's motion for partial summary judgment. For the reasons provided in this Memorandum Opinion and Order, the Court grants in part and denies in part both motions.

## FACTS

This controversy stems from Principal's conversion from a mutual insurance company into a public stock company, a process known as a "demutualization." Principal adopted its plan for demutualization on March 31, 2001. (Pl.'s LR 56.1(a)(3) ¶ 27.) When a mutual insurance company undergoes a demutualization, eligible policyholders receive compensation. (*See* Local 710's LR 56.1(a)(3) ¶ 2; Local 710's Ex. 1, Letter from Principal to Policyholders of 10/26/01.) This compensation is given because policyholders lose ownership interests in the mutual insurance company when it becomes a stock company. (Local 710's Ex. 1, Letter from Principal to Policyholders of 10/26/01.) In the instant case, the Health and Welfare Fund received compensation from Principal for four different employee benefit plans: an in-house pension plan, a severance plan, a life insurance plan, and a 401(k) plan. The Health and Welfare Fund now seeks a declaratory judgment as to whom is entitled to the demutualization compensation. The issues in this case are whether the demutualization compensation is an asset of the plans, and, if so, whether the compensation reverts to the participants of the plan or to the employers.

Local 710 is a local union affiliated with the International Brotherhood of Teamsters. (Pl.'s LR 56.1(a)(3) ¶ 5.) The Chicago Truck Drivers, Helpers and Workers Union Independent (the "CTDU") merged into Local 710 on February 1, 2001. (*Id.* ¶ 7.) The CTDU was an independent labor union representing employees in the trucking, warehousing, and related industries in and around the Chicago area. (*Id.* ¶ 6.) After the merger, the CTDU ceased operation as a labor organization, and Local 710 is a successor to the rights and liabilities of the CTDU. (*Id.* ¶¶ 12-13.) The Health and Welfare Fund and Pension Fund were established by the CTDU for the benefit of CTDU members covered by collective bargaining agreements with participating employers. (*Id.*)

2

The first of the benefit plans at issue in this case, a retirement plan for their office employees (the "in-house pension plan"), was established by the Health and Welfare Fund, the Pension Fund, and the CTDU in 1961. (*Id.* ¶ 14.) This plan was funded through a group annuity contract with Bankers Life and Casualty and later Principal. (*Id.*) It was funded by contributions from the Health and Welfare Fund, the Pension Fund, and the CTDU on behalf of their employees. (*Id.* ¶ 15.) The plan was terminated in 1987. (*Id.* ¶ 16.) When the plan was terminated, all active employees who would have been eligible for a benefit received a lump sum payment, while former employees who had retired and were receiving benefits continued to receive a defined monthly benefit through a group annuity contract with Principal. (*Id.* ¶¶ 17-18.) This contract was fully funded at the time of the discontinuation of the plan. (Pl.'s Ex. 3, Boudreau Aff. ¶ 20.) The Health and Welfare Fund received a check from Principal in the amount of $1,200,280.00 as demutualization compensation in connection with the in-house pension plan. (Pl.'s LR 56.1(a)(3) ¶ 31.)

The supplemental retirement and security plan ("severance plan") was established in 1969. (*Id.* ¶ 22.) Like the in-house pension plan, the severance plan is funded by an annuity contract with Principal. (*Id.* ¶ 23.) The severance plan is currently in effect for employees of the Health and Welfare Fund and the Pension Fund, but employees of the CTDU left the severance plan and received their benefit payments on or before the CTDU and Local 710 merged. (Pl.'s Ex. 3, Boudreau Aff. ¶¶ 26-27.) The Health and Welfare Fund received a check from Principal in the amount of $78,329.00 as demutualization compensation in connection with the severance plan. (Pl.'s LR 56.1(a)(3) ¶ 30.)

The employees' savings plan ("401(k) plan") was established in July, 1983. (*Id.* ¶ 20.) This plan is a voluntary program for employees and is funded by contributions by the

3

employees. (*Id.* ¶ 21.) The 401(k) plan is in effect for the employees of all three parties in this case - the Health and Welfare Fund, Pension Fund, and Local 710. (Pl.'s Ex. 3, Boudreau Aff. ¶ 32.) The Health and Welfare Fund received a check from Principal in the amount of $85,766.00 as demutualization compensation in connection with the 401(k) plan. (Pl.'s LR 56.1(a)(3) ¶ 31.)

Finally, the member life, accidental death, and dismemberment policy (the "life insurance plan") was established in February 1992. (*Id.* ¶ 24; Pension Fund's Ex. F, U.S. Dep't of Labor's Pension & Welfare Benefits Admin. Office of Regs. & Interpretations Advisory Op. 94-31A.) This plan was funded by contributions from the Health and Welfare Fund, the Pension Fund, and the CTDU on behalf of their respective employees. The benefits of this plan are paid through a group policy with Principal. (Pl.'s LR 56.1(a)(3) ¶ 26.) Employees of the Health and Welfare Fund and the Pension Fund currently participate in the plan, but the CTDU ceased participation in the life insurance plan upon its merger with Local 710. (Pl.'s Ex. 3, Boudreau Aff. ¶ 35.) The Health and Welfare Fund received 541 shares of Principal common stock as demutualization compensation in connection with the life insurance plan. (Pl.'s LR 56.1(a)(3) ¶ 32.)

Local 710 argues that the compensation from the demutualization reverts to the employers – the Health and Welfare Fund, the Pension Fund, and Local 710 as successor to the CTDU, with the exception of the 401(k) plan. (*Id.* ¶ 34.) The Health and Welfare Fund, on the other hand, argues that the demutualization compensation should be used for the benefit of the participants of the various plans. (*Id.* ¶ 35.) The Health and Welfare Fund brought suit, seeking a declaratory judgment of the rights of the parties to the demutualization compensation. (Compl. ¶ 32.) Before the Court is the Health and Welfare Fund's motion for summary judgment seeking a declaratory judgment that the demutualization compensation is a plan asset to be used for the

benefit of the participants of the plans and Local 710's motion for partial summary judgment, seeking a declaration that the demutualization compensation reverts to the employers.

## DISCUSSION

Pursuant to Federal Rule of Civil Procedure 56(c), the court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). When considering the evidence submitted by the parties, the court does not weigh it or determine the truth of asserted matters. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). All facts must be viewed and all reasonable inferences drawn in the light most favorable to the non-moving party. *NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). "If no reasonable jury could find for the party opposing the motion, it must be granted." *Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 931 (7th Cir. 1995).

Summary judgment is appropriate in this case because there are no material facts in dispute. Therefore, the movants are entitled to a judgment as a matter of law.

The first issue is whether the demutualization compensation is a plan asset of the various plans. ERISA does not define plan assets. *See Bannistor v. Ullman*, 287 F.3d 394, 402 (5th Cir. 2002). The U.S. Department of Labor has issued advisory opinions that address the issue of whether the demutualization compensation is a plan asset. (Pension Fund's Ex. A, U.S. Dep't of Labor's Pension & Welfare Benefits Admin. Office of Regulations & Interpretations Advisory Op. 92-02A (2002); Pl.'s Ex. 5, EBSA Advisory Op. 2001-02A n.1 (2001).) "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the

agency's answer is based on a permissible construction of the statute." *Mead Corp. v. B.E. Tilley*, 490 U.S. 714, 722 (1989). An agency's advisory opinions are not binding authority, but they are "entitled to deference, such that the interpretation will be upheld so long as it is reasonable." *Reich v. McManus*, 883 F. Supp. 1144, 1153 (N.D. Ill. 1995). "[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984).

According to the Department of Labor:

> The proceeds of the demutualization will belong to the plan if they would be deemed to be owned by the plan under ordinary notions of property rights. . . . In the case of an employee pension benefit plan, or where any type of plan or trust is the policyholder, or where the policy is paid for out of trust assets, it is the view of the department that all of the proceeds received by the policyholder in connection with a demutualization would constitute plan assets.

(Pl.'s Ex. 5, EBSA Advisory Op. 2001-02A n.1 (2001).) Determining whether the demutualization compensation consists of a plan asset under ordinary notions of property rights requires "consideration of any contract or other legal instrument involving the plan documents. It also requires the consideration of the actions and representations of the parties involved." (Pension Fund's Ex. A, U.S. Dep't of Labor's Pension & Welfare Benefits Admin. Office of Regulations & Interpretations Advisory Op. 92-02A (2002).)

In *Ruocco v. Bateman, Eichler, Hill, Richards, Inc.*, 903 F.2d 1232 (9th Cir. 1990), the Ninth Circuit Court of Appeals considered the issue of whether stock issued as demutualization compensation for a long-term disability insurance plan could revert to an employer. This plan was wholly funded by contributions from the participants of the plan. *Id.* at 1238. The court held that allowing the compensation to revert to the employers would give the employers an

undeserved windfall. *Id.* As a result, the "balancing of equities" weighed in favor of allowing the demutualization compensation to revert to the employees. *Id.*

Like the disability plan in *Ruocco*, the contributions to the 401(k) plan in this case were made entirely by the employees, outside of minor administrative costs. Therefore, the demutualization compensation should revert to the employees. This conclusion was undisputed and is now stipulated by the parties. (*See* Pension Fund's Resp. Pl.'s Mot. Summ. J. at 11-12; Local 710 Mem. Opp'n Pl.'s Mot. Summ. J. at 14; Joint Mot. Partial Dismissal & Release of Funds ¶ 4.) Moreover, like the plan in *Ruocco*, the 401(k) plan in this case is an employee pension benefit plan wholly funded by the participants of the plan. Because the plan was fully funded by the employees, they are entitled to the compensation as a result of their loss of ownership in Principal. As in *Ruocco*, awarding this compensation to the employers would give them an undeserved windfall — they would be receiving money as a result of the investment of the participants of the plans, not their own efforts. Accordingly, the demutualization compensation attributable to the 401(k) plan reverts to the employees.

Determining whether the demutualization compensation is a plan asset for the remaining plans is a closer issue. Following the guidelines of the EBSA, this Court will follow ordinary notions of property rights and look to the plan documents and representations by the parties to determine whether the demutualization compensation is a plan asset. There is no evidence that the parties made any representations other than in the plan documents as to whether or not the demutualization compensation is a plan asset. Therefore, this Court will focus on the language of the plans to determine this issue.

After examining the plan documents, this Court holds that the demutualization compensation is a plan asset for the in-house pension plan and the severance plan, but not for the

insurance plan. At first blush, the compensation would appear not to be a plan asset for any of the remaining plans because it is undisputed that these plans were funded by the employers. Determining that the compensation reverts to the plans and not the employers could therefore result in an undeserved windfall to the plans. However, both the in-house pension plan and severance plan are "employee pension benefit plans." As a result, the compensation would be presumed to be a plan asset under the EBSA Advisory Opinion unless language in the plan documentation suggests otherwise.

In interpreting the language of a contract, a court's primary purpose is to discern the intent of the parties. *See Volt Info. Scis., Inc. v. Bd. Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 488 (1989). In this case, however, neither the in-house pension plan nor the severance plan specifically addresses the issue of demutualization compensation. The demutualization compensation would therefore be presumed to be a plan asset under the EBSA Advisory Opinion 2001-02A quoted above. The plans do address the issue of whether any dividends awarded under the plans would revert to the employers or become plan assets. Both plans declare that "[d]ividends declared under the Group Contract and forfeitures shall be applied to reduce future Employer Contributions." (Pl.'s Ex. B, Health & Welfare Fund & Pension Fund Employees Retirement Plan at 21, Pl.'s Ex. D, Health & Welfare Fund & Pension Fund Employees Restated Supplemental Retirement & Security Plan at 22.) This language suggests that the dividends would become plan assets used to pay for the plans, rather than simply reverting to the employers to be used however they wish. Like dividends, the demutualization compensation at issue in this case comes from Principal. The language in the plans regarding dividends shows that the parties intended future compensation from Principal to become a plan asset. Although the language of the plans with regard to the disposition of dividends alone is not determinative,

coupled with the EBSA's view that demutualization compensation ordinarily becomes a plan asset for an employee pension plan, it is sufficient to convince the Court that the demutualization compensation is a plan asset for the in-house pension plan and the severance plan.

Local 710 argues that the language in the plans regarding dividends should not affect the outcome of this case because demutualization compensation is not a dividend. (Local 710's Mem. Opp'n Pl.'s Mot. Summ. J. at 10.) It is true that the demutualization compensation is not a dividend, but it is awarded to policyholders in exchange for loss of ownership interests in the company. Dividends are payments by a company to its stockholders. RICHARD A. BREALEY & STEWART C. MYERS, PRINCIPALS OF CORPORATE FINANCE 64 (5th ed. 1996). When a mutual insurance company demutualizes, it compensates policyholders for the loss of their ownership interests, which therefore includes their ability to receive dividends. *See id.* at 417-38.

Local 710 points out that Principal "will continue to pay policy dividends as declared." (Pl.'s Ex. K, Plan of Conversion of Principal Mut. Holding Co. at A-3.) However, this language only means that Principal will continue to pay *declared* dividends. It does not mean that Principal can award new dividends in the future. In addition, there is no evidence that Principal has awarded dividends for any of the plans at issue in this case. Therefore, the fact that demutualization compensation is not a dividend is insufficient to overcome the strong presumption that it is a plan asset given the specific facts of this case.

Although the demutualization compensation is a plan asset for the in-house pension plan and severance plan, this does not necessarily mean that it reverts to the participants of the plans. The plans state: "No part of the plan assets shall be paid to the Employer at any time, except that, after the satisfaction of all liabilities under the Plan, any assets remaining will be paid to the Employer. The payment may not be made if it would contravene any provision of law." (Pl.'s

Ex. B, Health & Welfare Fund & Pension Fund Employees Retirement Plan at 47; Pl.'s Ex. D, Health & Welfare Fund & Pension Fund Employees Restated Supplemental Retirement & Security Plan at 56.) Under the terms of the plans, therefore, the demutualization compensation, as a plan asset, may be distributed to the employers if the plan has satisfied all of its liabilities.

Because the in-house pension plan has been terminated, it has satisfied all of its liabilities to the participants and their beneficiaries. The Pension Fund argues that since former employees are continuing to receive benefits under this plan, the plan has not satisfied all of its liabilities. (Pension Fund's Resp. Mot. Summ. J. at 13.) However, it is undisputed that these participants are receiving their benefits under a plan that was fully funded at the time of the termination of the in-house pension plan. Therefore, the in-house pension plan has no "liabilities" and the demutualization compensation reverts to the contributing employers – the Health and Welfare Fund, the Pension Fund, and Local 710 as successor to the CTDU.

The plan provides that residual assets may be distributed to an employer so long as no provision of law is violated. ERISA addresses the issue of whether residual assets may be distributed to an employer:

> (d) Distribution of residual assets....
> (1) Subject to paragraph (3), any residual assets of a single-employer plan may be distributed to the employer if –
>> (A) all liabilities of the plan to participants and their beneficiaries have been satisfied,
>> (B) the distribution does not contravene any provision of law, and
>> (C) the plan provides for such a distribution in these circumstances.
>
> . . . .
>
> (3)(A) Before any distribution from a plan pursuant to paragraph (1), if any assets of the plan attributable to employee contributions remain after satisfaction of all liabilities . . . such remaining assets shall be equitably distributed to the participants who made such contributions or their beneficiaries .
> . . .

29 U.S.C. § 1344 (2003). The in-house pension plan satisfies all of these requirements. As noted above, all liabilities of the plan have been satisfied and the plan provides for a distribution of the assets to the employers. In addition, no provision of law has been violated, and the Health and Welfare Fund does not cite to any law that would be violated by distributing the compensation to the employers. Finally, it is undisputed that the employers were responsible for the contributions to the plans, not the employees. Therefore, no equitable distribution to the participants need be made.

The Health and Welfare Fund argues that the compensation cannot be distributed to three employers, *i.e.*, the Health and Welfare Fund, the Pension Fund, and Local 710, because the language of the statute is in the singular. The statute provides "any residual assets of a single-plan may be distributed to *the* employer . . . ." 29 U.S.C. § 1344(d) (emphasis added). The Court is not persuaded that this language prevents the compensation from being distributed to three employers when all three employers have made contributions to the plan. This is especially true because, as the Health and Welfare Fund points out, the plans at issue in this case are single-employer plans despite the fact that multiple employers fund the plans. (*See* Mem. Supp. Mot. Summ. J. at 7.) The Court therefore holds that the demutualization compensation for the in-house pension plan reverts to the three employers that are parties in this case – the Health and Welfare Fund, the Pension Fund, and Local 710.

Unlike the in-house pension plan, the severance plan has not been terminated and is currently in full force and effect for employees of the Health and Welfare Fund and the Pension Fund. Because the plan provides that the assets of the plan shall not be distributed to the employers until after satisfaction of all liabilities of the plan, the demutualization compensation does not revert to the employers. The compensation should be used to reduce future

11

contributions by the two remaining employers in the case - the Health and Welfare Fund and the Pension Fund. If at some point the Health and Welfare Fund and the Pension Fund satisfy all of their liabilities under the plan, Local 710 would then be entitled to a share of the demutualization compensation, using the same reasoning as applied to the in-house pension plan.

Unlike the in-house pension plan and the severance plan, the life insurance plan is not an employee pension plan. A "pension plan" is defined by ERISA as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program –
> (i) provides retirement income to employees, or
> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond . . . .

29 U.S.C. § 1002(2)(A). Unlike a pension plan, the life insurance plan fits under the ERISA definition of "an employee welfare benefit plan" because it provides "benefits in the event of . . . death . . . ." 29 U.S.C. § 1002(1)(A). The EBSA discussed the disposition of demutualization compensation for an employee welfare benefit plan in the Advisory Opinion 2001-02A, which states:

> [I]n the case of an employee welfare benefit plan . . . the appropriate plan fiduciary must treat as plan assets the portion of the demutualization proceeds attributable to participant contributions . . . . [and] the plan fiduciary should give appropriate consideration to those facts and circumstances that the fiduciary knows or should know are relevant to the determination, including the documents and instruments governing the plan . . . .

(Pl.'s Ex. 5, EBSA Advisory Op. 2001-02A at n.2.)

In this case, it is undisputed that the employers made all of the contributions to the plans. Therefore, there is no reason to treat any portion of the demutualization compensation as a plan asset. In addition, there is nothing in the language of the plan to suggest that the parties intended

demutualization compensation to become a plan asset. Unlike the in-house pension plan and the severance plan, there is no language in the life insurance plan regarding dividends. The plan is silent with respect to possible assets such as dividends or demutualization compensation. As a result, the employers have made no representations suggesting that demutualization compensation would be a plan asset in the language of the plans. Therefore, the Court holds that the demutualization compensation is not a plan asset for the life insurance plan and that it reverts to the Health and Welfare Fund, the Pension Fund, and Local 710.

The Pension Fund argues that Local 710 is not entitled to any of the demutualization compensation for the life insurance plan because Local 710 has not contributed to the plan. (Pension Fund's Resp. Pl.'s Mot Summ. J. at 11.) It is undisputed that the CTDU made contributions to the life insurance plan, however, and it is also undisputed that Local 710 is a successor to all the rights and liabilities of the CTDU. Therefore, Local 710 is entitled to a share of the demutualization compensation attributable to the contributions made by the CTDU.

## CONCLUSION

For the reasons provided in this Memorandum, the Court grants in part and denies in part the Health and Welfare Fund's Motion for Summary Judgment [doc. no. 12-1] and Local 710's Motion for Partial Summary Judgment [doc. no. 19-1]. The Court enters a declaratory judgment that: (1) the demutualization compensation attributable to the 401(k) plan reverts to the participants of the plan as stipulated in the Joint Motion for Partial Dismissal and Release of Funds; (2) the demutualization compensation attributable to the severance plan must be used to offset future employer contributions; and (3) the demutualization compensation attributable to

the in-house pension plan and life insurance plan reverts to the employers. This case is hereby terminated.

SO ORDERED            ENTERED: 3/4/05

*Ronald A. Guzman*

HON. RONALD A. GUZMAN
**United States Judge**